# United States Court of Appeals
# for the Federal Circuit

---

**IN RE: PERSONALWEB TECHNOLOGIES LLC,**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

**v.**

**PATREON, INC.,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

**v.**

**DICTIONARY.COM, LLC,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES,**

**INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

v.

**VOX MEDIA, INC.,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

v.

**VICE MEDIA, LLC,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

**v.**

**OATH INC.,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

**v.**

**BUZZFEED, INC.,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

**v.**

**POPSUGAR, INC.,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PERSONALWEB TECHNOLOGIES LLC,**
*Plaintiff-Appellant*

**LEVEL 3 COMMUNICATIONS, LLC,**
*Plaintiff*

**v.**

**ZIFF DAVIS, LLC,**
*Defendant-Appellee*

**AMAZON.COM, INC., AMAZON WEB SERVICES, INC.,**
*Intervenors*

————————————

2019-1918

————————————

Appeal from the United States District Court for the Northern District of California in Nos. 5:18-cv-05599-BLF, 5:18-cv-05606-BLF, 5:18-cv-05969-BLF, 5:18-cv-05970-BLF, 5:18-cv-06044-BLF, 5:18-cv-06046-BLF, 5:18-cv-

06612-BLF, 5:18-cv-07119-BLF, 5:18-md-02834-BLF, United States District Judge Beth Labson Freeman.

—————————

Decided: June 17, 2020

—————————

MICHAEL AMORY SHERMAN, Stubbs Alderton & Markiles LLP, Sherman Oaks, CA, argued for plaintiff-appellant. Also represented by VIVIANA H. BOERO HEDRICK, JEFFREY F. GERSH, WESLEY WARREN MONROE, STANLEY HUGH THOMPSON, JR.; SANDEEP SETH, SethLaw, Houston, TX.

J. DAVID HADDEN, Fenwick & West, LLP, Mountain View, CA, argued for all defendants-appellees and for intervenors. Defendants-appellees Vox Media, Inc., Vice Media, LLC, Oath Inc., BuzzFeed, Inc., Dictionary.com, LLC, Patreon, Inc., Ziff Davis, LLC, Popsugar Inc. and intervenors Amazon.com, Inc., Amazon Web Services, Inc. also represented by SAINA S. SHAMILOV, RAVI RAGAVENDRA RANGANATH; TODD RICHARD GREGORIAN, San Francisco, CA. Defendant-appellee Vice Media, LLC also represented by BENJAMIN J. BYER, Davis Wright Tremaine LLP, Seattle, WA; KIMBERLY HERMAN, Sullivan & Worcester, Boston, MA; CHRISTOPHER T. MCWHINNEY, Washington, DC. Intervenors Amazon.com, Inc., Amazon Web Services, Inc. also represented by JEFFREY H. DEAN, Amazon.com, Inc., Seattle, WA.

—————————

Before WALLACH, BRYSON, and TARANTO, *Circuit Judges.*

BRYSON, *Circuit Judge.*

Appellant PersonalWeb Technologies LLC filed a number of lawsuits charging dozens of customers of Amazon.com, Inc., and Amazon Web Services, Inc., (collectively "Amazon") with infringing several related patents.

Amazon responded with a declaratory judgment action seeking an order declaring that PersonalWeb's lawsuits against Amazon's customers were barred as a result of a prior lawsuit brought by PersonalWeb against Amazon, which was dismissed with prejudice. In the eight cases that are now on appeal, the district court agreed with Amazon that the consequence of the prior dismissal was to bar PersonalWeb's infringement actions against Amazon's customers. *In re: PersonalWeb Techs., LLC*, No. 5:18-md-02834-BLF, 2019 WL 1455332 (N.D. Cal. Apr. 2, 2019). We affirm.

I

A

There are five patents at issue in this appeal: U.S. Patent Nos. 5,978,791 ("the '791 patent"), 6,928,442 ("the '442 patent"), 7,802,310 ("the '310 patent"), 7,945,544 ("the '544 patent"), and 8,099,420 ("the '420 patent") (collectively, "the True Name patents"). All five patents share a largely common specification and claim priority to the same abandoned patent application, which was filed on April 11, 1995.

According to the specification, there was a problem with the way prior art computer networks of the mid-1990s identified data in their systems. There was "no direct relationship between the data names" and the contents of the data item. '442 patent, col. 2, ll. 13–14. The same file name in two different folders could refer to different data items, or two different file names could refer to the same data item. *Id.* at col. 2, ll. 15–17. Consequently, computer networks could become clogged with duplicate data, and the efficiency and integrity of data processing systems could be impaired. *Id.* at col. 2, line 30, through col. 3, line 43.

The inventors of the patents in suit purported to solve this problem by devising what they referred to as "True Names" for data items. *Id.* at col. 6, ll. 7–11. The True

Name system created a "substantially unique" identifier for each data item that depended only on the content of the data itself. *Id.*; *see also id.* at col. 3, ll. 30–33. The True Name system thus did not depend on other purportedly less reliable means of identifying data items, such as user-provided file names.

The common specification of the patents in suit teaches that file names in the True Name system can be created using a "hash function." *Id.* at col. 12, ll. 57–63. A hash function is a mathematical function that reduces a data block of arbitrary size and converts it into a relatively small, fixed-length sequence, "such that the True Name of the data block is virtually guaranteed to represent the data block B and only data block B." *Id.*

In the True Name system, a large file is first partitioned into smaller segments. The hash function is then applied to each segment. *Id.* at col. 14, ll. 16–35. The resulting values are strung together, and a hash function is applied to the entire string of values, to compute the True Name of the large file. *Id.*

The specification summarizes a variety of applications for the True Name invention, including using True Names (1) to avoid storing multiple copies of a file, when those copies have been assigned different names; (2) to avoid copying data from a remote location when a local copy is already available; and (3) to verify that data retrieved from a remote location is the data that was intended to be retrieved. *Id.* at col. 3, ll. 49–55; *see also id.* at col. 4, ll. 25–27.

B

In December 2011, PersonalWeb sued Amazon and one of Amazon's customers, Dropbox, Inc., for patent infringement in the United States District Court for the Eastern District of Texas. In the complaint, PersonalWeb alleged that "Amazon has infringed and continues to infringe [the True Name patents, among others] by its manufacture,

use, sale, importation, and/or offer for sale of the following products and services within the PersonalWeb Patent Field: Amazon Simple Storage Service (S3)[.]"

Amazon S3 provides web-based storage to certain customers, typically companies with websites. The customers can use S3 to store static content, such as images, for their websites. Information that is stored in the S3 system is stored in the form of "objects" that are organized into customer-created containers called "buckets." Once an object is stored in S3, it can be made available over the entire Internet.

To use an example featured in Amazon's brief, if a company creates a webpage containing a picture of a puppy, that picture can be stored in S3. When a user visits the company's website, the user's web browser is directed to download the puppy picture from S3 in order to display the website. The way the user's web browser asks to download the puppy picture from S3 is through a Hyper Text Transfer Protocol ("HTTP") "GET" request.[1]

S3 automatically generates an "ETag" for every object stored in S3. ETags provide useful identifying information about an object. For most objects, S3 creates an ETag by running a particular hash function on the object's content. If the object's content changes, the ETag changes. S3 uses ETags in several of its operations where it is helpful to know that identifying information.

For example, when the user downloads the puppy picture described above from S3, the user's computer might store that picture in the computer's temporary memory or cache. If the user requests the same file again, S3 compares the ETag for the file stored in the user's cache to the

---

[1]    HTTP is a standard communication protocol that web browsers and web servers follow in order to communicate with each other on the Internet.

file stored on S3. If the ETags are identical, S3 responds with a status code indicating that the user's computer already has a copy of the picture, so there is no need to download the picture again. If S3 does not contain a file with the same ETag, however, that indicates that the contents of the file have been changed. In that event, S3 will send the user's web browser the file containing the updated version of the picture. The parties refer to the request for a file in that scenario as a "conditional get request" because the operation will be performed only if a certain condition is met. PersonalWeb also refers to such conditional get requests as "cache control." Conditional get requests help avoid unnecessary downloads, thereby saving time and network bandwidth.

S3 also uses ETags when customers, such as companies with websites, upload objects to S3. One method of uploading that S3 supports is what Amazon calls the Multipart Upload Application Program Interface. The multipart upload function allows users to upload an object larger than five gigabytes as a series of parts. Once all the parts have been uploaded, S3 can assemble them into a single object for storage. S3 generates an ETag for each uploaded part as well as for the completed object. The ETags can be used to verify that none of the parts were corrupted during the upload.

In its infringement contentions in the Texas case, PersonalWeb referenced S3's use of both multipart upload and conditional get requests. The contentions are extensive, but they consist mainly of similar and sometimes identical material repeated numerous times. A commonly appearing feature in the infringement contentions is a reference to S3's use of ETags to compare the identity of different objects in order to determine whether or not to perform certain operations. *See, e.g.*, J.A. 1651 ("Amazon S3 causes the content-dependent name of the particular data item (the 'ETag') to be compared to a plurality of values (other 'ETags'). . . . When doing GET, HEAD, PUT/COPY

operation with certain conditional parameters, the existence of the particular item at a particular location is determined with Etag."); J.A. 1652 ("GetIfMatchEtags uses the received Etag attached by the user request and compares it with the digest contained in the node for that specific object to determine whether or not access to the object is allowed based upon the match or non-match of hashes."); J.A. 1653 ("Upon receiving the parts during multipart upload, the user's list of etags is used to compare with the etags that are generated for the parts to check for the correct parts before combining the parts.").

Consistent with its infringement contentions in the Texas case, PersonalWeb represented in a discovery motion in that case that S3's use of ETags to perform conditional operations infringed the True Name patents:

> The accused products in this case are Amazon's Simple Storage Service ("S3") and Amazon Web Services, LLC's Storage Gateway. S3 is a cloud storage service, and the accused functionalities of S3 include but are not limited to its "multipart upload" feature and "conditional operations." . . . In response to receiving each uploaded part of a file, S3 creates an ETag for the part uploaded, which is a MD5 hash of the contents of the part. PersonalWeb maintains that S3's use of these hash values infringes the patents-in-suit.

> A customer who stores files using S3 is able to send a variety of different requests to Amazon, *e.g.*, to get a file, to copy a file, or to put a file into storage. The customer can optionally require that the operation succeed or fail based on a comparison of a user-provided ETag against the ETag S3 has stored for the file in question, referred to as "conditional operations." For example, in S3's "conditional copy" feature, the two options are "If-Match" and "If-None-Match"—the former allowing a

successful copy operation only if the ETags match, and the latter only if the ETags do not match. If the match succeeds, then the copy operation is allowed to be performed; otherwise, S3 returns an error. *PersonalWeb maintains that S3's conditional operations infringe the patents-in-suit.*

J.A. 2045–46 (emphasis added).

After the district court issued its claim construction order in the Texas case, PersonalWeb stipulated to the dismissal of all its claims against Amazon with prejudice.[2] Pursuant to that stipulation, the district court in June 2014 issued an order dismissing all claims against Amazon with prejudice; the court subsequently entered final judgment against PersonalWeb.

C

Beginning in January 2018, PersonalWeb filed dozens of new lawsuits in various districts against website operators, many of which were Amazon's customers. PersonalWeb alleged that by using S3, Amazon's customers had infringed the True Name patents.

Amazon intervened in the actions against its customers and undertook the defense of the customer-defendants in all the cases now before this court. In addition, Amazon filed a declaratory judgment complaint against PersonalWeb, seeking an order barring PersonalWeb's infringement actions against Amazon and its customers based on the prior action against Amazon in the Eastern District of Texas. The Judicial Panel on Multidistrict Litigation consolidated the customer cases and the Amazon declaratory judgment action in a multi-district litigation proceeding,

---

[2] PersonalWeb had previously dismissed its claims against Dropbox, Inc., without prejudice. Dropbox is not a party to any of the cases before this court.

and assigned the consolidated cases to the United States District Court for the Northern District of California for pretrial proceedings. That court decided to proceed with the Amazon declaratory judgment action first. Based on input from the parties, the court selected one representative customer case (the case against Twitch Interactive, Inc.) to proceed along with the Amazon declaratory judgment action. The court stayed all the other customer cases. Because PersonalWeb represented that it would not be able to proceed in the other customer cases if it lost its case against Twitch, the district court relied on PersonalWeb's pleadings against Twitch as being representative of PersonalWeb's pleadings in the other customer cases.

In its counterclaim against Amazon in the declaratory judgment action, PersonalWeb alleged that S3 infringed the True Name patents when S3 used ETags to perform conditional operations. In particular, PersonalWeb accused S3's use of ETags to determine whether a customer's web browser should reuse its cached data or download a new, updated version of the data. According to PersonalWeb, "Amazon thereby reduced the bandwidth and computation required by its S3 web host servers (acting as origin servers for its web server customers) and any intermediate cache servers . . . ." J.A. 2929. PersonalWeb made similar allegations in its complaints against Amazon's customers.

PersonalWeb's infringement contentions tracked the complaints against Amazon's customers. For example, PersonalWeb alleged that "[t]he distribution of hosted webpage file content (content) to other computers such as outside intermediate cache servers and computers running web browsers . . . is controlled from an S3 website file host server (a first computer). This is done in response to a conditional HTTP GET request (a request) obtained by an S3 website file host server (a first device in the system) from another computer (a second device in the system) . . . ." J.A. 381. The conditional HTTP GET requests included

ETags that, according to PersonalWeb, corresponded to the claimed "content-dependent name."

## D

Amazon moved for summary judgment in its declaratory judgment action and partial summary judgment in PersonalWeb's infringement action against Twitch. Amazon argued that, in light of the with-prejudice dismissal of PersonalWeb's action against Amazon in the Texas case, PersonalWeb was barred from suing Amazon or its customers for infringement based on Amazon's S3 system.

The district court granted the motion in part. It held that claim preclusion barred PersonalWeb's claims regarding acts of infringement occurring prior to the final judgment in the Texas action, and that the *Kessler* doctrine, first adopted by the Supreme Court in *Kessler v. Eldred*, 206 U.S. 285 (1907), barred PersonalWeb's claims of infringement relating to S3 after the final judgment in the Texas action.

With respect to claim preclusion, the district court held that all the requirements of that doctrine were met. First, the court determined that the with-prejudice dismissal in the Texas action was a final judgment on the merits, and that PersonalWeb did not reserve any rights in the stipulated dismissal in that case. *In re PersonalWeb*, 2019 WL 1455332, at *6–7.

Second, the court concluded that Amazon's customers were in privity with Amazon. As the court explained, Amazon and its customers share the same interest in the unfettered use of Amazon's web services; Amazon adequately represented that interest in the Texas action; and Amazon agreed to indemnify its customers and assumed the defense of its customers against PersonalWeb's infringement charges. *Id.* at *7–9.

Third, the court ruled that the causes of action asserted in the Texas case and in the customer cases were the same.

The court rejected PersonalWeb's contention that the claims against Amazon in the Texas case were limited to the multipart upload features of S3, and did not extend to S3 generally. *Id.* at *10–13. The court concluded that "both the complaint and the infringement contentions in the Texas Action indisputably support the Court's conclusion that the Texas Action asserted infringement against all of S3 and was not limited only to [the multipart upload feature]." *Id.* at *12. Different features of the same product, the court ruled, do not give rise to separate causes of action. *Id.* at *13.

Finally, the court rejected Amazon's argument that claim preclusion applies through the expiration of the patents, and instead concluded that claim preclusion applies only up to the date of the final judgment in the Texas action. *Id.* at *13–14.

With respect to the *Kessler* doctrine, the district court held that the judgment in the Texas case gave rise to a limited trade right to continue producing, using, and selling the product at issue in that case "even when the acts of infringement occurred post-final judgment and even when it was third parties who allegedly engaged in those acts of infringement." *Id.* at *15 (internal quotation marks and citation omitted). The court rejected PersonalWeb's argument that the *Kessler* doctrine is "rooted in . . . issue preclusion" and does not apply because the judgment in the Texas case did not specifically adjudicate the issue of non-infringement. *Id.* at *14–16.

The district court then determined that its summary judgment ruling had the effect of disposing of the eight customer cases in which PersonalWeb alleged infringement based solely on the customer's use of Amazon's S3 system. Accordingly, the court dismissed those eight cases. PersonalWeb appeals from the judgment in those cases.

## II

PersonalWeb raises two primary challenges to the district court's decision.  First, PersonalWeb contends that claim preclusion is inapplicable to the actions against Amazon's customers because the Texas case involved a different feature of Amazon's S3 system, and therefore a different cause of action, than the feature that is at issue in the customer cases.  Second, PersonalWeb contends that the with-prejudice dismissal of the action against Amazon in the Texas case did not constitute an adjudication of non-infringement and is therefore insufficient to trigger the *Kessler* doctrine.[3]  We reject both challenges.

## A

Under the doctrine of claim preclusion, "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979).  Claim preclusion bars both those claims that were brought as well as those that could have been brought in the earlier lawsuit.  *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594–95 (2020); *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1053 (Fed. Cir. 2014); *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).

---

[3]    In the trial court, PersonalWeb also contended that claim preclusion applies only up to the date of the operative complaint in the prior action.  PersonalWeb has not challenged the trial court's ruling that "claim preclusion bars PersonalWeb's claims through the date of the final judgment in the Texas Action."  *In re PersonalWeb*, 2019 WL 1455332, at *13.  Because PersonalWeb has not appealed that aspect of the trial court's decision, we do not address it.

To the extent that a case turns on general principles of claim preclusion, as opposed to a rule of law having special application to patent cases, this court applies the law of the regional circuit in which the district court sits—here the Ninth Circuit. *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008). However, the question whether two causes of action for patent infringement are the same is an issue peculiar to patent law, and we therefore analyze that issue under Federal Circuit law. *Id.*

For purposes of claim preclusion, PersonalWeb does not dispute the district court's ruling that the with-prejudice judgment in the Texas case is a final judgment on the merits. PersonalWeb also does not challenge the district court's determination that Amazon and its customers are in privity, and thus are regarded as the same parties for claim preclusion purposes. The sole basis for PersonalWeb's challenge to the district court's finding on claim preclusion is its contention that the Texas action and the customer suits involved different causes of action.

In determining whether causes of action for patent infringement are the same, we are guided by the Restatement (Second) of Judgments (1982). *See SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1165 (Fed. Cir. 2018); *Acumed*, 525 F.3d at 1323–24. Following the approach taken in the Restatement, we define a cause of action by the transactional facts from which it arises, and we consider the extent of the factual overlap between the two alleged claims at issue. *See Gillig v. Nike, Inc.*, 602 F.3d 1354, 1363 (Fed. Cir. 2010) ("Claims arising from the same nucleus of operative facts are barred by res judicata."); *Senju Pharm. Co. v. Apotex Inc.*, 746 F.3d 1344, 1349 (Fed. Cir. 2014); *Acumed*, 525 F.3d at 1323–24 (citing Restatement § 24); *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478 (Fed. Cir. 1991) (noting that a "claim," i.e., a cause of action, "is used in the sense of the facts giving rise to the suit").

In patent cases, one of the areas of factual overlap we consider "is the overlap of *the product or process* accused in the instant action with *the product or process* accused in the prior action." *Senju*, 746 F.3d at 1349. Claim preclusion does not apply unless the products or processes are essentially the same. *Id.* (citing *Acumed*, 525 F.3d at 1324); *SimpleAir*, 884 F.3d at 1167. "Accused devices are 'essentially the same' where the differences between them are merely 'colorable' or 'unrelated to the limitations in the claim of the patent.'" *Acumed*, 525 F.3d at 1324 (quoting *Foster*, 947 F.2d at 480). We also consider whether the same patents are involved in both suits. *Senju*, 746 F.3d at 1349.

Importantly, under well-settled principles of claim preclusion, different arguments or assertions in support of liability do not all constitute separate claims. *See Foster*, 947 F.2d at 478. Regardless of the number of substantive theories available to a party and regardless of the differences in the evidence needed to support each of those theories, a party may not split a single claim into separate grounds of recovery and raise those separate grounds in successive lawsuits. *See Mars Inc. v. Nippon Conlux Kabushiki-Kaisha*, 58 F.3d 616, 619 (Fed. Cir. 1995); Restatement § 24 cmt. a. Rather, the party must raise in a single lawsuit all the grounds of recovery arising from a particular transaction that it wishes to pursue. *Mars*, 58 F.3d at 619.

PersonalWeb asserts that in the Texas case it accused only the multipart upload functionality of Amazon's S3 system. In the customer cases before the California court, PersonalWeb contends it has accused the "cache control" functionality, an entirely different feature of Amazon's S3 system. According to PersonalWeb, these different features constitute different products or processes for

purposes of claim preclusion analysis.[4]  PersonalWeb thus contends that the accused activity in the customer cases is not essentially the same as the activity that was accused in the Texas case, and that claim preclusion is therefore inapplicable in the customer cases.

Although PersonalWeb contends that the accused feature in the customer cases is different from the accused feature in the Texas case, PersonalWeb concedes that "the conditional GET commands" that are at issue in the customer cases were identified in the infringement contentions in the Texas case.  Appellant's Br. at 37.  Nonetheless, PersonalWeb contends that there were only a "handful" of references to those conditional operations in the Texas infringement contentions, not enough to constitute a substantial factual overlap.  Moreover, PersonalWeb contends that it referred to that infringement theory in the Texas case only by way of "analogy."

Contrary to PersonalWeb's assertions, PersonalWeb did not limit its infringement contentions in the Texas case to S3's multipart upload functionality.  As PersonalWeb told the trial court in the Texas case, "the accused functionalities of S3 include but are not limited to its 'multipart upload' feature and 'conditional operations.'"  PersonalWeb's assertion that it included conditional get requests in the Texas infringement contentions as analogies, not accusations, is thus at odds with the representations PersonalWeb made in the Texas case.  Because PersonalWeb accused the use of "conditional operations" in the Texas case, PersonalWeb's arguments regarding the purported

---

[4]     PersonalWeb also contends that the customer cases are different because they include a new product, Amazon CloudFront.  None of the customer cases before this court, however, involve accusations against CloudFront, so that argument is irrelevant to the resolution of this appeal.

differences between the multipart upload and the "cache control" functionalities of S3 are irrelevant.

In any event, regardless of the breadth of the specific infringement theories PersonalWeb pursued in the Texas case, it is clear that the complaints in the customer cases and the complaint in the Texas case relate to the same set of transactions.  In the Texas case, PersonalWeb alleged that it had been injured by acts of infringement consisting of the manufacture, use, sale, importation, and/or offer for sale of the Amazon S3 product.  Every alleged act of infringement in the eight customer cases before us is likewise based on the use of the same Amazon S3 product.

At most, PersonalWeb has shown that it emphasized different facts in support of a different theory of infringement in the prior case.  But that is not enough to avoid claim preclusion.  *See* Restatement § 24 cmt. c ("That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple transactions and hence multiple claims.  This remains true although the several legal theories depend on different shadings of the facts, or would emphasize different elements of the facts . . . .").  We therefore uphold the district court's ruling that claim preclusion principles bar PersonalWeb from pursuing infringement claims in the eight customer cases for actions predating the judgment in the Texas case.

B

In addition to the two traditional pillars of preclusion law—claim and issue preclusion—there is a separate and less frequently invoked doctrine that derives from the Supreme Court's decision in *Kessler v. Eldred*.  We have generally held that claim preclusion cannot apply to acts of alleged infringement that occur after the final judgment in the earlier suit.  *See Brain Life*, 746 F.3d at 1054; *see also Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 626 (Fed. Cir. 2015) ("It is well-established that, as to

claims for continuing conduct after the complaint is filed, each period constitutes a separate claim." (citations omitted)). Likewise, if the requirements of issue preclusion are not satisfied, relief under that doctrine will not be available to protect post-judgment activity. *Brain Life*, 746 F.3d at 1056. The *Kessler* doctrine, however, "fills the gap" left by claim and issue preclusion, by "allowing an adjudged *non-infringer* to avoid repeated harassment for continuing its business as usual post-final judgment in a patent action where circumstances justify that result." *Id.*

PersonalWeb contends that the *Kessler* doctrine does not apply in this case because Amazon is not an "adjudged non-infringer." In particular, PersonalWeb contends that the *Kessler* doctrine is based on principles of collateral estoppel, and that the doctrine therefore cannot be invoked unless the issue of infringement or invalidity was "actually litigated" in the prior case. PersonalWeb contends that "no issues" were actually litigated in the Texas case because PersonalWeb dismissed its claims before there was any adjudication.

We have previously addressed whether the *Kessler* doctrine precludes relitigation only of issues that were actually litigated in a prior action, albeit in slightly different contexts. In *Brain Life*, we explained that the *Kessler* doctrine barred all claims that were brought or "could have been brought" in the prior action. *Brain Life*, 746 F.3d at 1058–59; *see also* 18 Charles A. Wright *et al.*, *Federal Practice & Procedure* § 4409 & n.34 (3d ed. 2020 update) (characterizing *Brain Life* as utilizing the *Kessler* doctrine as a "substitute for claim preclusion" to bar claims against "conduct that the parties reasonably should expect to continue without change"). Similarly, in *SpeedTrack, Inc. v. Office Depot, Inc.*, we explained that

> the *Kessler* doctrine is a necessary supplement to issue and claim preclusion: without it, a patent owner could sue a manufacturer for literal

> infringement and, if unsuccessful, file suit against the manufacturer's customers under . . . any [patent] claim or theory not actually litigated against the manufacturer as long as it challenged only those acts of infringement that post-dated the judgment in the first action.  That result would authorize the type of harassment the Supreme Court sought to prevent in *Kessler* when it recognized that follow-on suits against customers could destroy the manufacturer's judgment right.

791 F.3d 1317, 1328 (Fed. Cir. 2015).

Likewise, in *SimpleAir* we said that the *Kessler* doctrine serves to fill the "temporal gap" left by claim preclusion, even if that gap is not filled by issue preclusion.  884 F.3d at 1170.  As *Brain Life*, *SpeedTrack*, and *SimpleAir* illustrate, we have treated the *Kessler* doctrine as a close relative to claim preclusion, without its temporal limitation, rather than as an early version of non-mutual collateral estoppel, as PersonalWeb characterizes it.

None of the other cases PersonalWeb cites requires that issues of noninfringement or invalidity be actually litigated before the *Kessler* doctrine can be invoked.  In *MGA, Inc. v. General Motors Corp.*, we said that "in its effect," the *Kessler* doctrine may be compared to defensive collateral estoppel.  827 F.2d 729, 734 (Fed. Cir. 1987).  PersonalWeb relies on that statement in an effort to confine the *Kessler* doctrine to instances in which collateral estoppel would apply.  But PersonalWeb's reliance on that statement from *MGA* is misplaced.  The question presented in *MGA* was whether Michigan state courts would have applied the *Kessler* doctrine.  *Id.* at 733.  We concluded that they would do so because the *Kessler* doctrine was sufficiently similar to the collateral estoppel law applied by Michigan state courts at the time.  *Id.* at 734 ("[W]e discern from a review of the law of the state of Michigan, that its courts would apply the *Kessler* doctrine, which in its effect may be

compared to defensive collateral estoppel[.]"). As our subsequent decisions interpreting *MGA* demonstrate, however, nothing we said in *MGA* limited *Kessler* to requiring that the issue of noninfringement or invalidity be "actually litigated," as PersonalWeb contends. *See Brain Life*, 746 F.3d at 1058–59; *SpeedTrack*, 791 F.3d at 1328.

Nor does *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017), impose such a requirement. In that case, Mentor sued EVE for patent infringement. The parties subsequently settled the case, with EVE taking a license to the patents. Following the licensing agreement and settlement, the trial court dismissed Mentor's claims with prejudice. *Id.* at 1297–98. Later, however, the licensing agreement was terminated. *Id.* at 1298. When Mentor sought to bring a second infringement action, EVE argued that the *Kessler* doctrine barred the lawsuit. We disagreed and held that the *Kessler* doctrine did not bar the second lawsuit against EVE over actions that took place after the termination of the license. Although the first suit was dismissed with prejudice, we noted that EVE was a willing licensee, not an adjudicated non-infringer. *Id.* at 1301. Under those circumstances, we held that *Kessler* did not permit EVE to infringe the patents with impunity after the license was no longer in effect. *Id.*

The with-prejudice dismissal of PersonalWeb's action against Amazon in the Texas case is quite different from the licensing agreement that ended the first action in the *Mentor* case. The dismissal in *Mentor* was contingent on the license; when the license was terminated, the contingency disappeared, and Mentor was free to re-initiate its infringement action. In this case, by contrast, there was no contingency attached to the with-prejudice dismissal to which PersonalWeb stipulated.[5] PersonalWeb abandoned

---

[5] PersonalWeb points to a provision in the stipulation and order of dismissal in the Texas case providing that

its claims against Amazon without reservation, explicit or implicit. The judgment in that case therefore stands as an adjudication that Amazon was not liable for the acts of infringement alleged by PersonalWeb.

The policy that drove the Supreme Court's decision in *Kessler* would be ill-served by adopting the rule proposed by PersonalWeb. The Court in *Kessler* recognized that even if a manufacturer of goods were to prevail in a patent infringement suit, the manufacturer could be deprived of the benefits of its victory if the patentee were free to sue the manufacturer's customers. The Court asked rhetorically whether, after Kessler had earned, "by virtue of the judgment, the right to sell his wares freely, without hindrance from Eldred [the patentee], must Kessler stand by and see that right violated . . . ?" *Kessler*, 206 U.S. at 289. To allow follow-up suits by the patentee against Kessler's customers, the Court explained, "will be practically to destroy Kessler's judgment right." *Id.* at 289–90. Accordingly, the Court concluded that, setting aside "any rights which Kessler's customers have or may have, it is Kessler's right that those customers should, in respect of the articles before the court in the previous judgment, be let alone by Eldred, and it is Eldred's duty to let them alone." *Id.* at 289. As the Court put the matter a few years after *Kessler*, a party that obtains a final adjudication in its favor obtains "the right to have that which it lawfully produces

---

Amazon retains "the right to challenge validity, infringement, and/or enforceability of the patents-in-suit via defense or otherwise, in any future suit or proceeding" and suggests that the language in question somehow limits the preclusive effect of the dismissal. Appellant's Reply Br. at 10 (quoting J.A. 335). That is plainly not so. The proviso protects Amazon, not PersonalWeb, and therefore does not in any way qualify the effect of the with-prejudice dismissal of PersonalWeb's claims in the Texas case.

freely bought and sold without restraint or interference." *Rubber Tire Wheel Co. v. Goodyear Tire & Rubber Co.*, 232 U.S. 413, 418 (1914); *see also SpeedTrack*, 791 F.3d at 1323.

Based on the Supreme Court's analysis in *Kessler* and *Rubber Tire Wheel*, we have characterized the *Kessler* doctrine as granting a "limited trade right" that attaches to the product itself. *SpeedTrack*, 791 F.3d at 1323 (quoting *MGA*, 827 F.2d at 734–35). The scope of that right is not limited to cases involving a finding of non-infringement that was necessary to the resolution of an earlier lawsuit, but extends to protect any products as to which the manufacturer established a right not to be sued for infringement. For that reason, the judgment in the Texas case, pursuant to a with-prejudice dismissal, protected Amazon's S3 product from subsequent infringement challenges, even when those challenges were directed at Amazon's customers rather than at Amazon itself.

Under PersonalWeb's narrower construction of the *Kessler* doctrine, a final, adverse disposition of a patentee's claims against the manufacturer of a particular product would not give the manufacturer protection from infringement actions against its customers for the use of the same product, unless the adverse decision was accompanied by a specific, contested adjudication of non-infringement. Such a proposition would leave the patentee free to engage in the same type of harassment that the Supreme Court sought to prevent in *Kessler*, a result that would be inconsistent both with *Kessler* itself and with this court's cases interpreting *Kessler*. *See Kessler*, 206 U.S. at 289–90; *SpeedTrack*, 791 F.3d at 1328–29; *Brain Life*, 746 F.3d at 1056, 1058–59.

We do not agree with PersonalWeb's contention that applying *Kessler* to voluntary dismissals with prejudice would contravene the public interest in the settlement of patent litigation. *See Foster*, 947 F.2d at 477 ("[T]he

Federal Circuit has repeatedly expressed the view that there is a strong public interest in settlement of patent litigation."). Contrary to PersonalWeb's assertions, the rule we apply here will not interfere with the ability of parties to resolve patent disputes. To the extent that a plaintiff wishes to settle an infringement action while preserving its rights to sue the same or other parties in the future, it can do so by framing the dismissal agreement to preserve any such rights that the defendant is willing to agree to. Settling parties will remain free to limit the preclusive effect of a dismissal; they simply have to fashion their agreement in a way that makes clear any limitations to which they wish to agree as to the downstream effect of the dismissal. *See, e.g., Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1295 (Fed. Cir. 2001); *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1231 (Fed. Cir. 2006).

We therefore reject PersonalWeb's contention that the issue of non-infringement must be "actually litigated" in order to invoke the *Kessler* doctrine. PersonalWeb's stipulated dismissal with prejudice in the Texas case operated as an adjudication on the merits for claim preclusion purposes. *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 719 F.3d 1367, 1372–73 (Fed. Cir. 2013) (citing 18A Charles A. Wright *et al.*, *Federal Practice and Procedure* § 4435 (2d ed. 2002)). That is, the with-prejudice dismissal resolved the dispute about liability for the alleged patent infringement that gave rise to the Texas action. Thus, the dismissal operated as an adjudication of non-liability for infringement for purposes of invoking the *Kessler* doctrine. Under that doctrine, the stipulated dismissal with prejudice conferred upon Amazon a limited trade right to continue producing, using, and selling Amazon S3 without further harassment from PersonalWeb, either directly or through suits against Amazon's customers for using that product.

**AFFIRMED**